**25-1201**

**UNITED STATES COURT OF APPEALS**

**FOR THE SIXTH CIRCUIT**

---

Marvin Cotton and Anthony Legion

Plaintiffs-Appellees,

vs.

Donald Hughes and Walter Bates

Defendants-Appellants

---

**On Appeal From The United States District Court**

**For The Eastern District Of Michigan**

**Southern Division**

---

# DEFENDANTS-APPELLANTS' BRIEF ON APPEAL

***ORAL ARGUMENT REQUESTED***

**CUMMINGS, MCCLOREY, DAVIS & ACHO, PLC**

**JAMES R. ACHO (P62175)**

**BRANDON L. WYKOFF (P81624)**

**Attorneys for Defendants-Appellees**

**17436 College Parkway**

**Livonia, Michigan 48152**

**734-261-2400**

## CORPORATE DISCLOSURE STATEMENT PURSUANT TO RULE 21.6

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

    a. Defendants-Appellants' answer: "No."

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

    b. Defendants-Appellants' answer: "No."

**Table of Contents**

STATEMENT IN SUPPORT OF ORAL ARGUMENT........................................ vi
STATEMENT OF JURISDICTION .................................................................. vii
STATEMENT OF ISSUES PRESENTED ......................................................... ix
STATEMENT OF FACTS ..........................................................................1
I. Introduction ..........................................................................................1
II. Jamond McIntyre's Murder and Detroit Police Department Investigation...4
III. Preliminary Examination Testimony..........................................................6
IV. Trial Testimony............................................................................................9
V. Post-Trial Evidence and CIU Investigation...................................................14
VI. Defendants' Motion for Summary Judgment..............................................15
SUMMARY OF ARGUMENT.......................................................................16
STANDARD OF REVIEW ..........................................................................18
ARGUMENT..............................................................................................19
I. PLAINTIFFS' CLAIMS ARE BARRED BY THE *HECK* DOCTRINE AND COLLATERAL ESTOPPEL WHERE THEIR CONVICTIONS WERE NOT OVERTURNED BY ANY AVENUE ALLOWED UNDER MICHIGAN LAW ...19
II. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WHERE COUNTS I THROUGH IV FAIL AS A MATTER OF LAW.................................27
A. PLAINTIFF'S *BRADY* CLAIMS FAIL BECAUSE A POLICE OFFICER'S DUTY TO DISCLOSE EXCULPATORY EVIDENCE WAS NOT CLEARLY ESTABLISHED IN 2001..........................................................................29
B. PLAINTIFF'S *BRADY* CLAIMS ARE MERITLESS BECAUSE THEY RELY EXCLUSIVELY ON INADMISSIBLE HEARSAY AFFIDAVITS WHICH FAIL TO MEET RULE 56 REQUIREMENTS ...............................................31
C. DEFENDANTS ARE OTHERWISE ENTITLED TO QUALIFIED IMMUNITY WHERE THERE IS INSUFFICIENT EVIDENCE TO PROVE THE OFFICERS ACTED IN BAD FAITH UNDER *BRADY* .........................................35
D. MALICIOUS PROSECUTION ......................................................................35

i. WHERE PLAINTIFF LEGION WAS SERVING A PRISON SENTENCE FOR AN UNRELATED CONVICTION, LEGION CANNOT ESTABLISH DEPRIVATION OF LIBERTY AS TO THE MCINTYRE CONVICTION ..........36

ii. PLAINTIFFS' CANNOT SHOW A LACK OF PROBABLE CAUSE WHERE THE NARD AND FRAZIER AFFIDAVITS TO THAT EFFECT ARE IMPERMISSIBLE HEARSAY..........38

E. PLAINTIFFS' FABRICATION OF EVIDENCE CLAIMS FAIL WHERE THERE WAS PROBABLE CAUSE TO PROSECUTE THEM AND WHERE THESE CLAIMS RELY EXCLUSIVELY ON INADMISSIBLE AFFIDAVITS ..38

CONCLUSION AND RELIEF REQUESTED ..........40

**Cases**

*Arizona v Youngblood*, 488 U.S. 51 (1988) ..........35
*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)..........29
*Barrow v. Pritchard*, 235 Mich. App. 478; 597 N.W.2d 853 (1999) ..........25
*Barton v Martin*, 949 F.3d 938, 950 (6th Cir. 2020)..........31
*Bell v. City of Southfield, Michigan*, 37 F.4th 362 (6th Cir. 2022) .......... viii
*Canter v County of Otsego*, 14 Fed Appx 518 (6th Cir. 2001) ..........30
*Carlton v. Pytell*, 986 F.2d 1421 (6th Cir. 1993).......... 25, 26
*Cone v. Bell*, 556 U.S. 449 (2009) ..........29
*Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008) ..........18
*Hatchett v. City of Detroit*, 714 F. Supp. 2d 708 (E.D. Mich. 2010) ..........26
*Heck v Humphrey*, 512 U.S. 477 (1994).......... passim
*Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) ..........35
*Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) ..........30
*Johnson v. Moseley*, 790 F.3d 649 (6th Cir. 2015)..........36
*Jones v. Clark County, Kentucky*, 959 F.3d 748, 765 (6th Cir. 2020)..........18
*Knoblauch v. Kenyon*, 163 Mich. App. 712 (1987) ..........25
*Kyles v. Whitley*, 514 U.S. 419, (1995) ..........30
*LeFever v. Ferguson*, 645 F. App'x 438 (6th Cir. 2016) ..........28
*Malley v. Briggs*, 475 U.S. 335, 341 (1986) ..........28
*Mitchell v. Forsyth*, 472 U.S. 527 (1985) ..........vii, viii
*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).......... 28, 31, 35
*Monat v State Farm Ins Co*, 469 Mich 679, 682-684; 677 NW2d 843 (2004) ..........25

*Payton v. City of Detroit*, 211 Mich. App. 375 (1995)............................................36
*Pearson v. Callahan*, 555 U.S. 223 (2009)..............................................................28
*People v. Reedy*, 151 Mich. App. 143; 390 N.W.2d 215, 217 (1986)......................39
*People v. Williams*, 483 Mich. 226, 239, n. 15; 769 N.W.2d 605, 613 (2009)........24
*Peterson v. Heymes*, 931 F.3d 546, 556-558 (6th Cir. 2019)..................... viii, 25, 27
*Ramsey v. Rivard*, No. 20-13124, 2023 WL 6279901 ............................................28
*Richardson v Jackson Co*, 432 Mich 377, 381; 442 NW2d 105 (1989)........... 24, 25
*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014) ...................................................39
*Saltmarshall v. Prime Healthcare Services-Garden City LLC*, 831 F. App'x 764
(6th Cir. 2020)...........................................................................................................36
*Saucier v Katz*, 533 US 194 (2002) ..........................................................................28
*Schreiber v Moe*, 596 F.3d 323, 334 (6th Cir. 2010)................................................19
*Smith v. County of Wayne*, No. 21-12070, 2023 WL 8788944 ...............................24
*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997).......................................39
*Strickler v. Greene*, 527 U.S. 263 (1999).................................................................30
*Thompson v. Clark*, 142 S. Ct. 1332 (2022).............................................................18
*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ................................................39

**Statutes**

28 U.S.C. § 1291 ........................................................................................... vii
28 U.S.C. § 1331 ........................................................................................... vii
28 U.S.C. § 2254 ...................................................................................... vii, 20
FRE 801 .......................................................................................................33
MCR 6.502 ............................................................................................ passim

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34, the Appellants hereby request an oral argument. Such oral arguments would be beneficial in assisting the court to apprehend the full significance of the arguments being made by Appellants, all of whom were law enforcement agents at the pertinent times, and are therefore shielded by qualified immunity.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction of this case pursuant to 28 U.S.C. § 1331, which vests such courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This appeal arises from a February 5, 2025 order of the district court denying the Defendants-Appellants' motion for summary judgment predicated on a claim of qualified immunity. The trial court's order was final for purposes of appeal under 28 U.S.C. § 1291 as construed in *Mitchell v. Forsyth*, 472 U.S. 527 (1985)

Plaintiffs' claims are also barred under the *Heck* doctrine and, relatedly, collateral estoppel, because their criminal convictions were not set aside under any of the avenues provided under *Heck v Humphrey*, 512 U.S. 477 (1994). Pursuant to *Heck*, § 1983 plaintiffs must prove their convictions were (1) reversed on direct appeal; (2) expunged by executive order; (3) declared invalid by a state tribunal authorized to make such a determination; or (4) questioned by a federal court's issuance of a writ of habeas corpus under 28 U.S.C. § 2254. Plaintiffs' convictions were never overturned under the process narrowly allowed under MCR 6.502, but were instead vacated by a stipulated order following a review by the Wayne County Conviction Integrity Unit. This Court has pendent appellate jurisdiction over this issue to the extent it is inextricably intertwined with the issue of qualified immunity. Specifically, because Plaintiffs' claims are barred by the *Heck* doctrine

and collateral estoppel, it follows that Defendants are shielded from this suit by qualified immunity.

Defendants' timely filed a notice of appeal on March 3, 2025. **(Notice of Appeal, ECF 109, PageID 5918).** This Court has jurisdiction of the appeal under F.R.A.P. 3 and 4 and 28 U.S.C. § 1291 because the amended judgment is a final decision of the district court under *Mitchell*, 472 U.S. at 530 and *Bell v. City of Southfield, Michigan*, 37 F.4th 362, 365-366 (6th Cir. 2022), and the notice was filed within thirty days of its entry. This Court also has pendant appellate jurisdiction over state tort issues. *Peterson v. Heymes*, 931 F.3d 546, 556-558 (6th Cir. 2019).

# STATEMENT OF ISSUES PRESENTED

1. Are Plaintiffs-Appellees' claims barred under the *Heck* doctrine and collateral estoppel where Plaintiffs-Appellees' convictions were never set aside under any of the specific avenues allowed under MCR 6.502?

   The Defendants-Appellants Respond: Yes
   The Trial Court Responded: No
   The Plaintiffs-Appellees Respond: No

2. Are Defendants-Appellants entitled to qualified immunity where a police officer's duty to disclose potentially exculpatory evidence under *Brady* was not clearly established in 2001?

   The Defendants-Appellants Respond: Yes
   The Trial Court Presumptively Responds: No
   The Plaintiffs-Appellees Respond: No

3. Are Defendants-Appellants entitled to qualified immunity where the facts, even when viewed in a light more favorable to Plaintiffs-Appellees, demonstrate there was probable cause for Plaintiffs-Appellees' arrest and prosecution?

   The Defendants-Appellants Respond: Yes
   The Trial Court Responded: No
   The Plaintiffs-Appellees Respond: No

4. Do Plaintiffs-Appellees' malicious prosecution claims fail where Anthony Legion suffered no deprivation of liberty by serving a concurrent sentence for an unrelated crime, and where Plaintiffs-Appellees' cannot otherwise demonstrate bad faith by the police officers, thus entitling Defendants to qualified immunity?

   The Defendants-Appellants Respond: Yes
   The Trial Court Responded: No
   The Plaintiffs-Appellees Respond: No

## STATEMENT OF FACTS

### I. Introduction

This lawsuit arises out of the murder of Jamond McIntyre, which occurred on January 24, 2001. On October 19, 2001, a jury found Plaintiffs Marvin Cotton and Anthony Legion guilty of McIntyre's murder, resulting in convictions to both for First-Degree Murder and Possession of a Firearm During Commission of a Felony. Plaintiffs were each sentenced to life in prison without the possibility of parole for the First Degree Murder charges and two years' imprisonment for the Felony Firearm Convictions. **(ECF 96-10, PageID 4493-4498)** Three days after his sentencing, Plaintiff Legion also pleaded no contest to second degree murder in an unrelated matter, meaning he was serving a concurrent sentence for that conviction, which carried a term of imprisonment of 8.5 to 20 years. **(ECF 96-28, PageID 4748-4751)** Because Plaintiff Legion was serving his second-degree-murder sentence the entire time he was incarcerated for McIntyre's murder, Plaintiff Legion's claim under the Wrongful Imprisonment Compensation Act (WICA) was dismissed. **(Id.)**

In connection to their prosecution and imprisonment, Plaintiffs accuse Defendants of engaging in *Brady* violations (Count I); Federal Malicious Prosecution (Count II); Fabrication of Evidence (Count III); and State Law

Malicious Prosecution (Count IV). **(ECF 22- First Amended Complaint)** After Defendants filed their motion for summary judgement, Plaintiffs voluntarily dismissed all claims against Defendants Santonin Adams and Ernest Wilson, and dismissed their federal and state malicious prosecution claims against Defendant Bates.

The instant interlocutory appeal arises out of the District Court's finding that (1) Plaintiffs' claims are not barred by the *Heck* doctrine and, relatedly, collateral estoppel; and (2) that Defendants Bates and Hughes are not entitled to qualified immunity based on perceived issues of material fact on whether these Defendants committed *Brady* violations, whether these Defendants fabricated evidence, and whether these Defendants had probable cause to prosecute Plaintiffs for purposes of their malicious prosecution claims. **(ECF 108- Opinion/Order Granting In Part/Denying In Part Defendant's Second Amended Motion for Summary Judgment)**

In arriving at this ruling, the District Court relied exclusively on two affidavits executed about 13 years after Plaintiffs' trial and about 7 years before this action was commenced. **(ECF 96-13, PageID 4511; ECF 96-14, PageID 4514)** One affiant, Ellis Frazier, previously testified at Plaintiffs' trial, only to claim over a decade later that his trial testimony was fabricated and that a witness statement he signed was pre-written by "the Homicide Detective." The second

affiant, Kurt Nard, claims he was told by the prosecution's key witness that said witness was threatened and induced to testify against Plaintiffs. Nard claims he told Defendant Bates this information. As such, Plaintiffs claim Bates concealed his alleged interview with Nard. Despite the fact these affidavits form the very foundation of Plaintiffs' claims, Plaintiffs produced neither for a deposition, meaning the District Court should have stricken them for failing to comply with Rule 56. The statements in the affidavits upon which Plaintiffs rely are otherwise hearsay.

As will be further demonstrated *infra*, Plaintiffs' claims fail under the *Heck* doctrine and collateral estoppel where neither conviction was set aside under any avenue strictly prescribed under MCR 6.502. Next, Defendants are entitled to qualified immunity where (1) *Brady* did not apply to police officers when Plaintiffs were prosecuted; (2) where the undisputed facts result in Plaintiffs' failure to satisfy the probable cause element of malicious prosecution, which is also fatal to Plaintiffs' fabrication of evidence claims; and (4) where Plaintiff Legion cannot satisfy the deprivation of liberty prong of malicious prosecution where he was serving a sentence for an unrelated crime at the time of his release.

## II. Jamond McIntyre’s Murder and Detroit Police Department Investigation

The subject murder occurred on January 24, 2001 at 3951 Third Street, Detroit MI 48201. At about 2:00 AM, Detroit Police officers responded to a report of shots fired. **(ECF 102-2, PageID 4918)** The responding officers observed shell casings on the front porch. A grey or silver van was reportedly in the driveway and had been struck by gunfire. Across the street, Jamond McIntyre (“McIntyre”), a reputed drug dealer, lay dead in a nearby alley with several gunshot wounds.

Defendant Santonion Adams was a Detroit police officer at the time of McIntyre’s murder. He was off-duty at the time he witnessed the murder. Adams stated he was sitting in the driver’s seat of the grey/silver van when three men “rush[ed] the house and start[ed] chas[ing McIntyre].” **(Id, PageID 4920)** Adams could not retrieve his service pistol and instead used a gun he found on the floor of the van. Adams stated he fired shots at the three men, who returned fire and hit the van. Adams reportedly lost his weapon after he escaped the area by climbing over a fence.

Kenneth Lockhart also lived at 3951 Third Street and was in the upstairs bedroom with his girlfriend, Renee Tate, when the shooting began. Lockhart gave a statement on January 24, 2001, stating he was watching a movie in the master bedroom and had dozed off. **(ECF 96-3, PageID 3579)** McIntyre called Lockhart

earlier to let Lockhart know he was on his way home and to keep the door unlocked. Lockhart witnessed McIntyre arrive by himself, at which point Lockhart and Renee moved into another bedroom. Later, Lockhart received a call from "Tone" (Defendant Adams) who was trying to get ahold of McIntyre. Lockhart later heard Adams enter and leave the house. After hearing a door open, Lockhart opened his bedroom door to see a blue Dodge Durango parked outside, which he described as one of McIntytre's friends. Later, Lockhart noticed the blue Durango was gone and he heard McIntyre yell "Ken help me." From here, Lockhart heard the gunfire, he exited his bedroom to find a gun and reportedly saw one of the assailants. When Lockhart raised his gun at the assailant, the assailant looked up and said "kill him." Lockhart reportedly fired one shot then went back into his room and shut his door. He didn't leave his room until police arrived.

Lockhart gave another written statement on February 15, 2001 after participating in a photographic lineup. **(ECF 102-6, PageID 4947)** Here, Lockhart identified photos 2, 5, and 7 as the three assailants he saw the morning of McIntyre's murder. Lockhart identified #5 as the person that came into his house and pointed a finger at Lockhart, further identifying #5 as the man who was wearing a multicolored jacket at the time of the murder. Lockhart stated #2 looked like "the guy in the kitchen that I shot at" and #7 "looks like the other guy. They came into the house first and then number #5 came into the house. Notably,

Lockhart stated the same three men were at his house the day before playing pool in the basement and that #5 had gloves on when he played pool. The #2 photo is denoted as Plaintiff Anthony Legion. #5 is denoted as Plaintiff Marvin Cotton and #7 is denoted as nonparty Devonte Parks. Lockhart specifically stated "#5 looks like the one for sure, he is the one that said kill him" and that #2 or #7 looks like the one I shot at." **(Id., See also ECF 102-7, PageID 4949).**

### III. Preliminary Examination Testimony

Plaintiffs' preliminary examinations were held on March 6, 2001 and March 12, 2001. Here, Lockhart testified he and Renee moved into another bedroom when McIntyre arrived home because McIntyre usually stays in the master bedroom. **(ECF 102-10, PageID 4966)** He again described witnessing the blue Dodge Durango when he later exited the bedroom. **(PageID 4967).**

Adams first called Lockhart looking for McIntyre. **(PageID 4968-4969)** Hearing voices, Lockhart looked out of his bedroom and saw Adams in the house with McIntyre. **(PageID 4970)** Lockhart then fell asleep and was awakened by gunfire. **(PageID 4971-4972)** Lockhart heard McIntyre first call for "Tone" and then say, "Ken, help me." **(PageID 4972)**

Lockhart testified to going to the master bedroom to retrieve a gun. **(PageID 4973)** He returned to his bedroom and through the slightly open door was able to observe a "little, short guy with a goatee" **(PageID 4977)** in the kitchen

rummaging through drawers, a gun in his left hand. A second man walked past the bedroom door toward the basement. (**PageID 4974)** Similar to his second statement, Lockhart testified that he had a verbal exchange with a third man wearing a red, beige, and yellow, multi-colored, leather jacket, who instructed the others to kill Lockhart. (**PageID 4974)** From the witness stand, Lockhart identified the third man as Cotton. Lockhart also identified Legion as the man in the kitchen. (**PageID 4974 and 4977)** Following Cotton's command, Lockhart fired a shot toward Legion. **(PageID 4980)** The weapon jammed and Lockhart slammed the bedroom door closed. He did not leave the room until the DPD arrived. **(PageID 4985-4986)**

Lockhart testified to seeing Cotton several times before the murder, including the day before where three men came by the house looking for McIntyre and played pool in the basement. **(PageID 4987-4988).**

Kirk Washington witnessed the events from his fourth floor apartment across the street from 3951 Third Street. **(ECF 96-4, PageID 3638).** Washington was awoken by gunfire and also witnessed two men, one wearing a multi-colored jacket, "shooting at the house or the car." **(PageID 3639)** The men tossed their weapons and "either ran inside the car or they ran inside the house." **(PageID 3640-3641** When asked if he saw any vehicles in the area, Washington recalled a "gray-colored two-door convertible." **(PageID 3641)** Washington did not describe

the car at which the men were firing. In his Witness Statement, the men fired at a gray convertible from which gunfire was returned.

Defendant Santonin Adams also testified during the preliminary examination, largely in conformity with his witness statement. At approximately 2:00 a.m. on January 24, 2001, he was in the driveway of 3951 Third Street, seated in a parked van he had borrowed from McIntyre. **(ECF 96-5, PageID 3652)** He called McIntyre when he arrived and was waiting for McIntyre to join him. **(Id.)** An unknown woman exited the home and drove away in a blue Dodge Durango. **(PageID 3653)** Several minutes later, Adams heard McIntyre call his name. When he looked toward the porch, he observed two men standing on either side of the front door and firing guns. **(PageID 3653-3654)** Adams conceded he did not see their faces, but claimed "one of them had on "a red coat with some colors on it." The other man had on a dark colored coat. **(PageID 3654-3655)**

Adams took cover on the floor of the van and attempted to draw his service weapon but was unable as it was caught in the holster and knitted sweater he was wearing. Laying on the floor of the front seat, Adams saw a "small Glock up under the passenger seat." **(PageID 3656)** Adams fired at the men with the Glock. **(PageID 3656-3657)**

Adams claimed he opened the van door and heard McIntyre's voice: "Tone, help." **(Id.)** Adams observed two men appear from an alley between two buildings

across the street. He described seeing a Chrysler Sebring convertible in the middle of the street. **(PageID 3659).**

Plaintiffs were bound over to circuit court on multiple felony charges, including first degree premeditated murder, assault with intent to murder, and felony firearm. **(PageID 3673-3674)** Specifically, the court found sufficient evidence for premeditation based on the testimony of Adams and Lockhart. In terms of identifying Plaintiffs as the shooters, the court observed that the individuals were identified with certain clothing and that the shooters were observed from outside by Adams and from inside of the house by Lockhart. **(PageID 3674-3675)**

## IV. Trial Testimony

Plaintiffs' jury trial began on October 15, 2001 at the Third Circuit Court before Hon. Daniel Ryan. **(ECF 96-6- Trial Transcript; Vol 01, PageID 3678)** Neither Plaintiff testified.

Lockhart testified in conformity with his preliminary examination. **(ECF 96-7, PageID 3914)** Lockhart arrived home on January 23, 2000 between 5:00 and 5:30 PM. **(PageID 3922)** McIntyre arrived at the home at about 8:00 PM with a couple of his cousins but left the home after about 45 minutes. **(PageID 3923)** McIntyre called Lockhart at about midnight asking Lockhart to keep the door unlocked because McIntyre didn't have his key. **(PageID 3924-3925)** Lockhart and

Tate went into another room before McIntyre arrived home, whereupon McIntyre went into the master bedroom. Lockhart remembered McIntyre arrived alone. **(PageID 3924-3925)**

Again, Lockhart awoke to gunfire in the early morning hours of January 24, 2001. **(PageID 3933)** From here, Lockhart obtained a handgun from the master bedroom and returned to the other bedroom. **(PageID 3937-3938)** After cracking the bedroom door, Lockhart saw the front door and the kitchen. **(PageID 3933; 3937; 3941)** Initially, Lockhart didn't recognize the man he saw in the kitchen nor the man heading toward the basement: "It wasn't that I didn't get a good look. It was just that I didn't recognize who they were." **(PageID 3944))** Lockhart was shocked to recognize Cotton at the front door, as this was "someone that [McIntyre]…trusted." **(PageID 3946-3947)** Lockhart went on to explain—as he had at the preliminary examination—that Cotton had been to the house on several occasions, and that McIntyre, Cotton, and he played pool at the home the day before McIntyre's murder. **(PageID 3947-3948)** Again, Lockhart described Cotton as wearing "red multi-colored jacket" on the night of the murder. **(PageID 3955)** From the witness stand, Lockhart identified Cotton and Legion as two of the three men he saw in the house after McIntyre was assaulted, going so far as to say that he was "one-hundred percent sure" that he encountered Cotton and "ninety percent sure" in his identification of Legion. **(PageID 3958)**

Defense counsel questioned Lockhart at length regarding the lack of any physical description of the attackers in his first Witness Statement, in which he crossed out various lines. **(PageID 3980)** Lockhart suggested that, in taking down his Witness Statement, the police failed to record all of the information Lockhart provided them or paraphrased certain things he said. **(PageID 3971-3972)**

Defendant Santonin Adams testified after Lockhart and testified in line with his preliminary exam testimony. Adams testified that he and McIntyre were close and grew up together. **(PageID 4038)** Adams went on to reiterate his preliminary exam testimony regarding the events leading up to McIntyre's murder. Adams described the Sebring convertible parked adjacent to the Third Street house as "light blue or light green with a black top on it." **(PageID 4047)** Adams also testified that one of the shooters wore a red coat but added that it had "colors in it." **(PageID 4054)**

Kirk Washington testified again at trial, providing details beyond those included in his witness statement. After hearing gunshots, Washington went to his window where he observed two men, one in a colorful jacket and another in dark clothes, shooting "towards the house that was across the street." **(PageID 4117)** They also shot at a gray minivan, then tossed the guns onto a roof. **(PageID 4118)** A gray convertible pulled up in front of the house, which the shooters ran toward and entered. **(Id).**

When the prosecutor presented Washington his Witness Statement, drawing attention to his claim that the two men were shooting toward a gray Chrysler, Washington reformulated his exam testimony and stated that the Chrysler did not appear until the shooting had stopped. **(PageID 4123)** He also recanted that the shooters fired directly at the minivan but reiterated that he saw the men enter the Chrysler. **(PageID 4123 and 4125)**

Ellis Frazier testified at trial, having previously executed a witness statement describing a conversation he had with Cotton and "Anthony:" "A guy name Marvin Cotton was talking about his case to a Co-defendant name Anthony I don't know his last name." "Anthony" told Marvin to ask Frazier (a/k/a "Old School") about whether they should do a bench or jury trial. **(ECF 102-13, PageID 5070-5071)** Per this statement, Frazier told Cotton to take a jury trial and "I got into detail about the case with them." Cotton told Frazier he and "Anthony and "a third guy that wasn't caught went over on Third Street and killed a guy named J."

Frazier testified at trial substantially in line with his signed statement. The jury further heard that on June 28, 2001, Frazier was in a holding cell with "Anthony," who he understood to be Cotton's co-defendant. Cotton, whom Frazier had never met, was in an adjacent cell and not visible to him. **(ECF 96-8, PageID 4218-4219)** Frazier made an in-court identification of Cotton but did not identify

Legion as the "Anthony" with whom he shared a cell. Cotton allegedly spoke with Frazier near the wall separating the holding cell. **(PageID 4237).**

According to Frazier, Cotton confided that he (Cotton), "Anthony," and a short, bald man went to a house on Third Street, where they killed a man named "Jay" and took several thousand dollars from a safe. Cotton also stated Lockhart and a female companion witnessed Cotton leave the scene in his mother's green Chrysler Sebring. **(PageID 4228)** Cotton explained that the "Anthony" in Frazier's cell was innocent, as the 6'3" Frazier claimed that his cellmate was his height. **(PageID 4232, 4258)** When the prosecutor presented Frazier with Parks's photograph, Frazier identified Parks as "Anthony." **(PageID 4261)**

Lockhart's girlfriend, Renee Tate, also testified at trial. Tate testified two days before the murder that three men knocked on the door. She looked out the window at them but didn't answer the door. Tate later saw the same men at the house the day before McIntyre's murder playing pool in the basement**. (ECF 96-9, PageID 4404-4405)**

The defense called Carl Frederick, a Detroit Police sergeant assigned to the Homicide Section. Sgt. Frederick spoke with Lockhart, who described McIntyre being chased around the interior of the house by three intruders. **(PageID 4335-4336)** The gunmen fired at Lockhart before chasing McIntyre out of the house. **(PageID 4336)** Lockhart claimed he fired shots at the three attackers as they

chased McIntyre. **(Id.)** Although a spent shell casing was found across from Lockhart's bedroom on the dining room floor, no bullet hole was discovered. **(PageID 4336-4337)** According to Frederick, Lockhart "changed his story several times…and what he said we couldn't substantiate by the physical evidence." **(PageID 4337)** Frederick, a 37-year Detroit Police veteran with 25 years in the Homicide Section, believed McIntyre was a "dope man" and that 3951 Third Street was a "dope house." **(PageID 4339-4330)**

As stated in the beginning, each Plaintiff was found guilty and sentenced to life without possibility of parole.

### V. Post-Trial Evidence and CIU Investigation

Pertinent to this appeal are the affidavits of Ellis Frazier and Kurt Nard. Over ten years after signing a statement implicating Plaintiffs in McIntyre's murder and testifying to that effect, Ellis Frazier signed an affidavit on March 29, 2014, claiming his trial testimony was "completely fabricated and untrue." The Wayne County Conviction Integrity Unit (CIU) issued a press release on October 1, 2020 revealing the results of their investigation into Plaintiffs' prosecutions and convictions. The CIU describes Lockhart as follows: "The witness in Mr. Legion and Mr. Cotton's cases who testified at trial was the same male identifying witness in the third defendant's case" and Ellis Frazier "a male jail house informant." **(ECF 102-24, PageID 5477)** And although the CIU never interviewed Nard or Frazier,

their report outlines the substance of their affidavits as grounds for vacating Plaintiffs' convictions: Notably, the CIU stated neither Cotton nor Legion were exonerated and that the CIU recommended their convictions be vacated. **(PageID 5478)** Inexplicably, the report states both cases are "unable to be re-tried" without even a perfunctory legal analysis as to why that is. **(PageID 5479)** During CIU's interview with Plaintiff Legion, it was made clear that the potential outcomes were either an exoneration or a new trial. **(ECF 96-31, PageID 4761)**

## VI. Defendants' Motion for Summary Judgment

Defendants presented the foregoing to the District Court below. Following substantive briefing and oral argument on October 31, 2024 before Judge Judtih Levy, Judge Levy issued an opinion and order on February 5, 2025. **(ECF 108, PageID 5843)** In sum, Judge Levy granted Defendants' motion in part by ruling Plaintiffs could not proceed on a *Brady* claim relying on statements Defendant Hughes made during a recorded conversation with a since-deceased private investigator hired by Plaintiff Cotton. **(Id. at p. 47)** Pertinent to this appeal, Judge Levy held (1) Plaintiffs' claims were not barred by collateral estoppel or the *Heck* doctrine; (2) Plaintiff Legion's denial of relief under the Wrongful Imprisonment Compensation Act (WICA), at best, presented a question of fact on how long Legion would have been incarcerated absent the McIntyre conviction, thus creating a question of fact over whether he suffered a deprivation of liberty for purposes of

malicious prosecution; (3) that the Nard affidavit created a question of fact over whether Bates suppressed evidence that Lockhart's testimony was fabricated and that the content of Nard's affidavit was not hearsay; (4) that the Frazier affidavit created a question of fact on whether Bates and Hughes committed *Brady* violations; (5) that the Nard and Frazier affidavits created a question of fact regarding Plaintiffs' malicious prosecution claims against Hughes; and (6) that a finding of probable cause did not foreclose Plaintiffs' fabrication of evidence claims and that Plaintiffs otherwise submitted evidence showing a lack of probable cause (again, by way of the Nard and Frazier affidavits). This appeal followed.

## SUMMARY OF ARGUMENT

Plaintiffs' claims for malicious prosecution, *Brady* violations, and fabrication of evidence are barred under the *Heck* doctrine because these claims necessarily imply the invalidity of their convictions where their convictions were not properly invalidated through any recognized legal avenue (appeal, habeas corpus, or MCR 6.502). Rather, Plaintiffs' convictions were vacated by stipulated orders lacking the required procedural safeguards and judicial findings under MCR 6.502, rendering them legally insufficient to surmount *Heck*. Judge Levy's contrary ruling relied on non-binding commentary and was erroneous. By the same token, under collateral estoppel (and crossover estoppel), key issues—such as probable cause—were already decided in the original criminal trial. Because those issues

were not reversed through valid legal means, Plaintiffs cannot relitigate them in this civil suit.

It follows that Defendants are otherwise protected by qualified immunity. The alleged constitutional violations were either not clearly established at the time or are unsupported by admissible evidence. Specifically, at the time of the alleged violations (2001), it was not clearly established that police officers—not just prosecutors—had a constitutional duty under *Brady*. Even if this duty applied, the claims rely entirely on two affidavits, the pertinent substance of which is inadmissible hearsay, and where neither witness was produced for deposition or shown to be available for trial.

Specific to Plaintiff Legion, he cannot show a deprivation of liberty for purposes of malicious prosecution where he was concurrently serving time for an unrelated conviction. The Michigan Court of Claims already ruled on this issue, barring re-litigation under collateral estoppel. Additionally, both Plaintiffs cannot show a lack of probable cause for purposes of malicious prosecution without relying on inadmissible affidavit evidence.

Finally, as to Plaintiffs' fabrication of evidence claims, Plaintiffs must show Defendants' *knowingly* put forth false evidence, which affected the jury's decision. Yet, both Plaintiffs were bound over for trial based on a finding of probable cause (following a preliminary examination), and the criminal convictions were, again,

not properly overturned under MCR 6.502 or any other legal avenue. Otherwise, the only evidence of fabrication again comes from inadmissible affidavits.

Basded on the foregoing and as will be demonstrated in greater detail below, Defendants request that this Honorable Court reverse the District Court's February 5, 2025 order and remand this case with instructions to grant full summary judgment in favor of Defendants Bates and Hughes.

## **STANDARD OF REVIEW**

This Court reviews a lower court's decision based on qualified immunity *de novo*. See *Jones v. Clark County, Kentucky*, 959 F.3d 748, 765 (6th Cir. 2020) overruled on other grds in *Thompson v. Clark*, 142 S. Ct. 1332 (2022). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

This Court's review of whether *Heck v. Humphrey*, 512 U.S. 477 (1994) bars a suit because the suit "would necessarily imply the invalidity of his conviction or sentence," is *de novo*. *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008); *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

This Court construes the complaint in the light most favorable to the plaintiffs, accepts all well-pleaded factual allegations as true, and examines

whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face."' *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE BARRED BY THE *HECK* DOCTRINE AND COLLATERAL ESTOPPEL WHERE THEIR CONVICTIONS WERE NOT OVERTURNED BY ANY AVENUE ALLOWED UNDER MICHIGAN LAW

In *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), the Supreme Court held that if a state prisoner's success in a § 1983 suit for damages would "necessarily imply the invalidity of his conviction or sentence," then "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." To determine whether a § 1983 claim would imply the invalidity of a previous conviction, this Court must consider both the claims raised under § 1983 and the specific offenses for which the § 1983 claimant was convicted. *Schreiber v Moe*, 596 F.3d 323, 334 (6th Cir. 2010). Here, Plaintiffs' claims are necessarily based on the conclusion that their convictions were invalid. Their claims for malicious prosecution argue there was no probable cause; their fabrication of evidence claims argue evidence was knowingly fabricated, which affected the jury's' decision to convict; and their *Brady* claims necessarily argue their criminal trials were prejudiced by the concealment of exculpatory evidence.

To determine whether the conviction was invalidated, *Heck* instructs that a plaintiff "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254" . *Id* at 486-487. Here, Plaintiffs' convictions were not reversed on direct appeal (they were upheld by the Michigan Court of Appeals and Michigan Supreme Court), expunged by executive order, called into question by a writ of habeas corpus, or invalidated by a state tribunal authorized to do so. In an attempt to show the convictions were invalidated, Plaintiffs point to stipulated orders entered by the Wayne County Circuit Court. **(ECF 96-27, PageID 4745; ECF 96-29, PageID 4754; ECF 96-30, PageID 4757)** These orders do not satisfy MCR 6.502, which sets forth a *mandatory* procedure for seeking relief from a judgment of criminal conviction:

> "Rule 6.502 Motion for Relief From Judgment
>
> (A) **Nature of Motion.** The request for relief under this subchapter must be in the form of a motion to set aside or modify the judgment. The motion must specify all of the grounds for relief which are available to the defendant and of which the defendant has, or by the exercise of due diligence, should have knowledge.
>
> (B) **Limitations on Motion.** A motion may seek relief from one judgment only. If the defendant desires to challenge the validity of additional judgments, the defendant must do so by separate motions. For the purpose of this rule, multiple convictions resulting from a single trial or plea proceeding shall be treated as a single judgment.

(C) **Form of Motion.** The motion may not be noticed for hearing, and must be typed or legibly handwritten and include a verification by the defendant or defendant's lawyer in accordance with MCR 1.109(D)(3). Except as otherwise ordered by the court, the combined length of the motion and any memorandum of law in support may not exceed 50 pages double-spaced, exclusive of attachments and exhibits. If the court enters an order increasing the page limit for the motion, the same order shall indicate that the page limit for the prosecutor's response provided for in MCR 6.506(A) is increased by the same amount. The motion must be substantially in the form approved by the State Court Administrative Office, and must include:

(1) The name of the defendant;

(2) The name of the court in which the defendant was convicted and the file number of the defendant's case;

(3) The place where the defendant is confined, or, if not confined, the defendant's current address;

(4) The offenses for which the defendant was convicted and sentenced;

(5) The date on which the defendant was sentenced;

(6) Whether the defendant was convicted by a jury, by a judge without jury, or on a plea of guilty, guilty but mentally ill, or nolo contendere;

(7) The sentence imposed (probation, fine, and/or imprisonment), the length of the sentence imposed, and whether the defendant is now serving that sentence;

(8) The name of the judge who presided at trial and imposed sentence;

(9) The court, title, and file number of any proceeding (including appeals and federal court proceedings) instituted by the defendant to obtain relief from conviction or sentence, specifying whether a proceeding is pending or has been completed;

(10) The name of each lawyer who represented the defendant at any time after arrest, and the stage of the case at which each represented the defendant;

(11) The relief requested;

(12) The grounds for the relief requested;

(13) The facts supporting each ground, stated in summary form;

(14) Whether any of the grounds for the relief requested were raised before; if so, at what stage of the case, and, if not, the reasons they were not raised;

(15) Whether the defendant requests the appointment of counsel, and, if so, information necessary for the court to determine whether the defendant is entitled to appointment of counsel at public expense.

Upon request, the clerk of each court with trial level jurisdiction over felony cases shall make available blank motion forms without charge to any person desiring to file such a motion.

(D) **Return of Insufficient Motion.** If a motion is not submitted on a form approved by the State Court Administrative Office, or does not substantially comply with the requirements of these rules, the court shall either direct that it be returned to the defendant with a statement of the reasons for its return, along with the appropriate form, or adjudicate the motion under the provisions of these rules. When a pro se defendant files his or her first motion effectively seeking to set aside or modify the judgment but styles the motion as something other than a motion for relief from judgment, the court shall promptly notify the defendant of its intention to recharacterize the pleading as a motion for relief from judgment; inform the defendant of any effects this might have on subsequent motions for relief, see MCR 6.502(B), (G); and provide the defendant 90 days to withdraw or amend his or her motion before the court recharacterizes the motion. If the court fails to provide this notice and opportunity for withdrawal or amendment, or the defendant establishes that notice was not actually received, the defendant's motion cannot be considered a motion for relief from judgment for purposes of MCR 6.502(B), (G). The clerk of the court shall retain a copy of the motion."

See MCR 6.502(A) through (D).

Accordingly, any request for relief from a judgment of conviction "**must** be in the form of a motion to set aside or modify the judgment." MCR 6.502(A). "Must" denotes a mandatory requirement. This is underscored by the rule's requirement of specific information which "must be substantially in the form approved" and requiring a court clerk to reject a motion if it does not comply with these requirements. MCR 6.502(C) and (D).

These requirements ensure criminals are released only when a court has examined the basis and made appropriate findings to warrant their release. The process used to release Plaintiffs deviated from these requirements, leaving no judicial supervision. No motion and brief were filed and none of the requisite information was provided. The stipulated orders cite no law, recite no specific facts supporting grounds for the relief sought, and do not explain whether any ground for the requested relief had been raised before, and if so, at what stage of the proceedings, and if not, the reasons why it was not raised.

The stipulated orders vacating Plaintiffs' convictions and releasing them from confinement fail to even substantially comply with MCR 6.502. As such, they are insufficient under *Heck* to show Plaintiffs criminal conviction were declared invalid by a tribunal with authority to make such a determination.

The District Court disagreed with the foregoing arguments. Specifically, Judge Levy held there was no authority to say a state court's vacation of a

conviction is invalid “based on an alleged procedural inadequacy.” **(ECF 108, PageID 5863)** For this basis, Judge Levy further relied on a prior decision from the Eastern District of Michigan in *Smith v. County of Wayne*, No. 21-12070, 2023 WL 8788944, at *11 (E.D. Mich. Dec. 19, 2023) *Smith* looked to the commentary to MCR 6.501 to conclude the rule “clearly indicates that the procedural hurdles established in that chapter of the state court rules cabin *the right of a defendant* to present a motion for relief from judgment.” *Id.* at *12 (emphasis in original). Respectfully, “a staff comment to the Michigan Court Rules is not binding authority.” *People v. Williams*, 483 Mich. 226, 239, n. 15; 769 N.W.2d 605, 613 (2009). This is particularly true when a staff comment departs from the plain language of MCR 6.502, which provides specific avenues for setting aside a conviction, none of which were followed by the stipulated orders Plaintiffs rely upon.

Accordingly, Plaintiffs’ stipulated orders are properly seen as ultra vires and provide no basis for satisfying *Heck*. See *Richardson v Jackson Co*, 432 Mich 377, 381; 442 NW2d 105 (1989) (defining ultra vires as “activity not expressly or impliedly mandated or authorized by law.”) *Richardson* applies here where no attorney had authority to set Plaintiffs free by stipulation without the judicial oversight *required* by MCR 6.502. Thus, the District Court should have dismissed

Plaintiffs' claims where each one violates *Heck* by necessarily implying the invalidity of their convictions or sentences.

Because Plaintiffs' convictions were not properly set aside, their claims are further barred by collateral estoppel. Three elements must be satisfied for the doctrine to apply. First, a question of fact essential to the judgment must have actually been litigated and determined by a final judgment; second, the same parties or their privies must have had a full and fair opportunity to litigate the issue; and third, there must be mutuality of estoppel. *Monat v State Farm Ins Co*, 469 Mich 679, 682-684; 677 NW2d 843 (2004). Mutuality of estoppel requires that, in order for a party to estop their adversary from relitigating an issue, that party taking advantage of the earlier judgment would have been bound by it, had it gone against them. *Id.* at 684. However, mutuality of estoppel is not required where collateral estoppel is being employed defensively. *Id.* at 691-692.

Michigan law also recognizes crossover estoppel, which precludes re-litigation of an issue from a criminal proceeding in a later civil proceeding, and vice versa. *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019), quoting *Barrow v. Pritchard*, 235 Mich. App. 478; 597 N.W.2d 853, 855-56 (1999). *See also Carlton v. Pytell*, 986 F.2d 1421 (6th Cir. 1993), citing *Knoblauch v. Kenyon*, 163 Mich. App. 712 (1987) (emphasis added); see also Restatement Judgments (2d) § 85(2)(a). Further, "Michigan's courts have established several exceptions to the

mutuality requirement. One exception to the mutuality rule apparently exists when the first suit is a criminal matter and the second suit is a civil matter. *Carlton v. Pytell*, 986 F.2d 1421 (6th Cir. 1993), citing *Knoblauch*, at 712.

Here, Plaintiffs' claims fail where a prior judgment already decided there was probable cause to prosecute them. Even when a criminal conviction is overturned, collateral estoppel can still bar legal issues resolved against the criminal defendant in prior proceedings. *Hatchett v. City of Detroit*, 714 F. Supp. 2d 708 (E.D. Mich. 2010) aff'd, 495 Fed. Appx. 567 (6th Cir. 2012). In that case, Hatchett originally confessed to several crimes after several hours of questioning by police. *Id*. at 710. Hatchett's defense attorney moved to suppress the confession, and a hearing was held to determine whether it was voluntary. *Id*. at 714. After his conviction, biological evidence from the crime was re-examined through the Cooley Law School Innocence Project, which provided exonerating DNA evidence. *Id*. at 710. Later, Hatchett and the Macomb County Prosecutor stipulated to his release. *Id*. at 710. Hatchett then filed a civil suit alleging violations of 42 U.S. § 1983, claiming the police violated his due process rights by coercing his confession. *Hatchett*, at 714.

Applying Michigan law on collateral estoppel, the district court held plaintiff was collaterally estopped from re-litigating the voluntariness of his confession because the issue was conclusively resolved against him in the criminal pretrial

proceedings. *Id*. at 714-19. The state court's determination was "binding in a subsequent civil action even if the criminal charges have been dismissed in the interim." *Id*. at 718. The court granted summary judgment for the defendants and this Court affirmed it in an unpublished opinion. 495 Fed.Appx. 567 (6th Cir. 2012).

In *Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019), this Court affirmed the denial of summary judgment, indicating that a vacated conviction loses all preclusive effect. This Court did not overturn *Hatchett*, but distinguished it because the appeal decision was unpublished and it was "not clear that the criminal conviction [in Hatchett] had actually been vacated." *Id.* at 554.

The different outcome in *Hatchett* and *Peterson* supports Defendants' position. In *Peterson*, the state court vacated the conviction based on a motion for relief of judgment. In *Hatchett*, the case was dismissed under a stipulation by the prosecutor and the criminal defendant, and no Michigan Court Rule was cited. 714 F.Supp. 2d at 710.

## II. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WHERE COUNTS I THROUGH IV FAIL AS A MATTER OF LAW

Appellants, all of whom were City of Detroit police officers at the pertinent times, are entitled to qualified immunity. When evaluating claims for qualified immunity, the Sixth Circuit "considers whether there was (1) a constitutional

violation, (2) **of a clearly established right,** and (3) whether the plaintiff has alleged facts supported by evidence showing that an official engaged in objectively unreasonable conduct." *LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016) citing *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) Qualified immunity applies unless the official's conduct violated such a right. *Pearson v. Callahan*, 555 U.S. 223 (2009)

Further, each component of the qualified immunity analysis must be subjected to the Fed. R. Civ. P. 56 analysis. As has been held in this regard:

> When the qualified immunity defense is raised in a motion for summary judgment, *courts must weave the summary judgment standard into each step of the qualified immunity analysis*. *The plaintiff is obliged to demonstrate with evidence in the record both that the challenged conduct violated a constitutional right and that the right was clearly established at the time*. If the plaintiff fails to establish either element, the defendant is immune from suit.

*Ramsey v. Rivard*, No. 20-13124, 2023 WL 6279901, at *14 (E.D. Mich. Sept. 26, 2023) (internal citations omitted) (emphasis added).

In *Malley v. Briggs*, 475 U.S. 335, 341 (1986), the Supreme Court first held qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. The Supreme Court has further explained that a court must ask whether it would have been clear to a reasonable officer that the alleged conduct "was unlawful in the situation he confronted." *Saucier v Katz*, 533 US 194, 202 (2002) In other words, existing precedent must have placed the

statutory or constitutional question beyond debate. *Malley* 475 U.S. at 341; *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### A. PLAINTIFF'S *BRADY* CLAIMS FAIL BECAUSE A POLICE OFFICER'S DUTY TO DISCLOSE EXCULPATORY EVIDENCE WAS NOT CLEARLY ESTABLISHED IN 2001

The District Court relied exclusively on the affidavit of Kurt Nard in ruling (1) a question of fact existed over whether Defendant Bates spoke to Nard, and thereby concealed evidence that Lockhart's testimony was fabricated and (2), if a jury believed Bates spoke to Nard, a jury could also find this was relayed to Hughes based on Bates' testimony that he reported directly to Hughes. **(ECF 108 at 4243)** Next, the District Court relied on the affidavit of Ellis Frazier in holding (1) a reasonable jury could find Bates committed a *Brady* violation by inducing Frazier to sign a false prewritten statement and by coaching his trial testimony; and (2) there was a genuine issue of fact on whether Hughes took part in fabricating Frazier's testimony based on Cotton's testimony that Hughes walked Frazier to the courthouse to testify. **(ECF 108 at 49-51).**

*Brady v. Maryland*, 373 U.S. 83 (1963) recognized a constitutional requirement applicable to the prosecution's pretrial conduct. Specifically, *Brady* prohibits withholding evidence "favorable to an accused" and "material to [his] guilt or to punishment." *Cone v. Bell*, 556 U.S. 449, 451 (2009). To establish a

*Brady* violation, Plaintiffs must show: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the state suppressed the evidence, "either willfully or inadvertently"; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

In *Kyles v. Whitley*, 514 U.S. 419, (1995), the Supreme Court first held the prosecutor's obligations under *Brady* extended to evidence known to the police: "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id* at 437. This obligation was on the prosecutor, not the police. See also *Canter v County of Otsego*, 14 Fed Appx 518, 521 n. 1 (6th Cir. 2001)

By the time of Plaintiffs' trial in late 2001, it was not "clearly established" if disclosure under *Brady* even applied to police officers. For example, in *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000), an equally divided en banc panel of Fourth Circuit summarized the state of *Brady* obligations at the time: "Supreme Court decisions establishing the *Brady* duty on the part of prosecutors do not address whether a police officer independently violates the Constitution by withholding from the prosecutor evidence acquired during the course of an investigation." *Id* at 659. The divided en banc Fourth Circuit held it was "left unclear the exact nature of any duty that the law imposes on police with regard to exculpatory evidence." *Id*. One thing *was* clear, however: "to speak of the duty binding police officers as a

*Brady* duty is simply incorrect. The Supreme Court has always defined the *Brady* duty as one that rests with the prosecution." *Id*. at 660. Accordingly, Plaintiffs' *Brady* claims are barred by qualified immunity where it was not clearly established in 2001 that *Brady* applied to police officers.

Plaintiffs bear the burden of showing that a right was clearly established at the time of an alleged injury. *Barton v Martin*, 949 F.3d 938, 950 (6th Cir. 2020). Again, the right in question must be *clearly established* for Plaintiffs to surmount qualified immunity. Plaintiffs will likely cite *Moldowan*, a 2009 decision from this Court, to argue a police officer's *Brady*-derived obligations existed as early as 1990. Clearly established law exists  only where there exists a robust consensus of cases of persuasive authority. *al-Kidd*, 563 U.S. at 741-42. Critically, *Moldowan* stated in 2009 that the Sixth Circuit had not addressed this issue directly. 578 F3d at 383. Further, in holding that police officers had *Brady*-derived obligations as early as 1990, *Moldowan* relied on only three cases from other circuits — hardly a robust consensus. *Id.* at 382.

### B. PLAINTIFF'S *BRADY* CLAIMS ARE MERITLESS BECAUSE THEY RELY EXCLUSIVELY ON INADMISSIBLE HEARSAY AFFIDAVITS WHICH FAIL TO MEET RULE 56 REQUIREMENTS

Even if *Brady* applied to Defendants in 2001, which Defendants vehemently contend it did not, the District Court's ruling on this issue relied exclusively on the

Nard and Frazier affidavits. Despite having the burden of proof and relying on these affidavits as the primary basis for their claims, Plaintiffs did not produce Nard or Frazier for a deposition and Defendants were unable to locate them. Despite this, the District Court accepted the affidavits at face-value because FRCP 56 allows parties to rely on affidavits to oppose summary judgment. (ECF 108 at 35). However, Rule 56(c)(4) only allows affidavits which "set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated." Although each affiant stated *in early 2014,* that they would testify to the substance of their affidavits, Plaintiffs have not shown that either Frazier or Nard are *currently* available to testify such that they are "competent to testify on the matters stated."

Without Nard or Frazier's availability to testify and undergo cross-examination either at trial or in a pretrial deposition, the substance of their affidavits are reduced to impermissible hearsay. The District Court held Nard's affidavit did not constitute hearsay because Nard's statements about Lockhart being threatened by Johnson, Lockhart's statements to Nard, and Nard's statements to Bates, were simply not being offered for their truth. Rather, the District Court held each layer of hearsay was offered to prove Johnson threatened Lockhart and that Bates had knowledge of what Lockhart told Nard.

As this Court is well aware, hearsay is defined as a statement the declarant does not make while testifying at the current trial or hearing and which a party offers in evidence to prove the truth of the mater asserted in the statement. FRE 801. Judge Levy held Nard's affidavit was admissible for the non-hearsay purposes stated above. The Nard affidavit deals with multiple levels of hearsay, including (1) that McIntyre's uncle (Johnson) threatened and paid Lockhart in order to testify against Plaintiffs; (2) what Lockhart told Nard about Johnson's threats, and (3) that Nard supposedly relayed the foregoing to Bates. While (1) has a non-hearsay purpose for effect on the listener and (2) has a non-hearsay purpose for showing favorable evidence might have existed, (3) is plain and simple hearsay. In other words, even if Johnson's threats and inducements to Lockhart are used for their effect on the listener and Lockhart's statement to Nard is used to show the existence of favorable evidence, Nard's statement under paragraph 13 is plain and simple hearsay. This is because Nard states he contacted the Detroit Police, that Defendant Bates interviewed him, and that Nard never heard back from Bates or the Detroit police afterward. **(ECF 96-14, PageID 4515).** Plaintiffs' offer this statement for the truth of its content, e.g. that Nard contacted Bates, and therefore Bates knew Lockhart was potentially being paid or induced to give false testimony. Plaintiffs *Brady* claims hinge on whether Bates and Hughes *knew* about what

Lockhart told Nard but still concealed it. And the only evidence to that effect is impermissible hearsay.

Similarly, the Ellis Frazier's affidavit alleges his trial testimony regarding Cotton's confession as to McIntyre's murder was "completely fabricated and untrue;" that his witness statement was composed by "the Homicide Detective'" and that, contrary to his trial testimony, he had contacted the Wayne County Prosecutor's Office to volunteer to inform on other inmates to secure an early release from jail. **(ECF 96-13, PageID 4511-4512)** Further, Frazier claims he was contacted by a detective who provided Frazier with names, locations, and other details necessary for him to testify convincingly. Frazier claims he never met Cotton, but was shown pictures to allow him to make an in-court identification. Agan, Plaintiffs' offer this statement for the truth of its content- that Frazier's testimony was concocted through the efforts of Bates and Hughes. Once again, Plaintiffs' *Brady* claims depend entirely on whether Bates and Hughes knew about and concealed exculpatory evidence, which Plaintiffs attempt to prove by way of Frazier's affidavit, which is being used for the truth of its content.

### C. DEFENDANTS ARE OTHERWISE ENTITLED TO QUALIFIED IMMUNITY WHERE THERE IS INSUFFICIENT EVIDENCE TO PROVE THE OFFICERS ACTED IN BAD FAITH UNDER *BRADY*

Finally, Plaintiffs' *Brady* claims fail where there is insufficient evidence to show Defendants acted with bad faith. Withholding evidence does not violate the Due Process Clause if the evidence was only "potentially useful" unless the "criminal defendant can show bad faith on the part of the police." *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) To the extent Plaintiffs rely on *Moldowan* to argue bad faith is not a necessary element to a *Brady* claim, it cannot be disputed that *Moldowan* contradicts established Supreme Court precedent on this very issue. See *Arizona v Youngblood*, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." No admissible evidence suggests Defendants-Appellants acted in bad faith by intentionally withholding evidence knowing it had exculpatory value.

### D. MALICIOUS PROSECUTION

Plaintiffs' state and federal malicious prosecution claims remain as to Defendant Hughes only and fare no better. To satisfy the elements of such a claim, Plaintiffs must establish four elements: (1) that Defendants initiated a criminal prosecution against them; (2) that there was no probable cause for the criminal

prosecution; (3) that Plaintiffs suffered a deprivation of their liberty; and (4) the criminal proceeding resolved in plaintiff's favor. *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015)

Michigan's version of malicious prosecution mirrors the federal version, but additionally requires that a plaintiff establish that the defendant acted with malice. *Saltmarshall v. Prime Healthcare Services-Garden City LLC*, 831 F. App'x 764, 771 (6th Cir. 2020) "An officer acts with malice when he knowingly swears to false facts without which there is no probable cause*." Id.* citing *Payton v. City of Detroit*, 211 Mich. App. 375 (1995).

### i. WHERE PLAINTIFF LEGION WAS SERVING A PRISON SENTENCE FOR AN UNRELATED CONVICTION, LEGION CANNOT ESTABLISH DEPRIVATION OF LIBERTY AS TO THE MCINTYRE CONVICTION

Plaintiff Legion's claim under the Wrongful Imprisonment Compensation Act (WICA) was dismissed because, mere days after being convicted for McIntyre's murder, he pled no contest to second degree murder, which carried a prison term of 8.5 to 20 years. **(ECF 96-28, PageID 4748-4751)** As he did in the District Court below, Legion argued to the Michigan Court of Claims that he would have been released earlier for his second degree murder charge if not for vacatur of the McIntyre conviction. The State of Michigan argued the WICA does not permit compensation based on a hypothetically shorter sentence for Legion's second

degree murder conviction. The Court of Claims held: "**Legion's concurrent sentence was independent of his wrongful convictions and covered the entirety of his imprisonment for his wrongful convictions." (PageID 4750)** As to Legion's arguments based on a hypothetical release date, the Court of Claims astutely noted this "would raise a host of additional issues, such as who has the burden of proof regarding the hypothetical release date this Court should use and what evidentiary standard should be applied to those proofs." **(PageID 4751)**

Rather than acknowledge the Court of Claims ruling as collateral estoppel on the legal issue of deprivation of liberty, the District Court simply held there was a question of fact on when Legion would have been released for second degree murder. This ruling raises the exact problem the Court of Claims portended: what is the burden of proof on a hypothetical release date? Will the jury be allowed to speculate at trial as to when Legion would have been released for second degree murder? The answer is much more simple. The District Court erred in finding an issue of fact in this regard when the Court of Claims already ruled Legion's independent conviction covered the entirety of his imprisonment related to the McIntyre murder. Collateral estoppel bars re-litigation of this legal issue. The legal issue of whether Legion was confined for the McIntyre murder rather than for second degree murder was litigated and determined by a final judgment in the Court of Claims and Legion had a full and fair opportunity to litigate this issue in

the Court of Claims. Therefore, because the Court of Claims already held Legion was already imprisoned the entire time for a separate offence, Legion cannot establish a deprivation of liberty for purposes of malicious prosecution.

#### ii. PLAINTIFFS' CANNOT SHOW A LACK OF PROBABLE CAUSE WHERE THE NARD AND FRAZIER AFFIDAVITS TO THAT EFFECT ARE IMPERMISSIBLE HEARSAY

As previously stated, the substance of the Nard and Frazier affidavits are being used for the truth of their content to the extent Nard claims to have told Bates about Nard's conversations with Lockhart and where Frazier states his testimony was fabricated through the efforts of Bates and Hughes. There is otherwise no indication Nard or Frazier will testify at trial in order to satisfy Rule 56's limitations on affidavits. Where exclusion of these hearsay statements results in a failure of Plaintiffs' *Brady* claims, the exclusion of this evidence also means Plaintiffs cannot establish a lack of probable cause to sustain their claims for malicious prosecution.

### E. PLAINTIFFS' FABRICATION OF EVIDENCE CLAIMS FAIL WHERE THERE WAS PROBABLE CAUSE TO PROSECUTE THEM AND WHERE THESE CLAIMS RELY EXCLUSIVELY ON INADMISSIBLE AFFIDAVITS

A person's constitutional rights are violated when evidence is knowingly fabricated, and where there exists a reasonable likelihood that the false evidence

would have affected the jury's decision. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). To establish a fabrication of evidence claim, Plaintiffs must prove (1) evidence was knowingly fabricated and (2) that a reasonable likelihood exists that the evidence affected the jury's decision. *Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015).

Count III of Plaintiffs' First Amended Complaint alleges that Hughes fabricated "Lockhart's identification of Plaintiffs and Davontae Parks," and that Bates fabricated "Frazier Jr.'s statement and testimony of Cotton's jailhouse confession." **(ECF No. 3, PageID.59)**

Plaintiffs fabrication of evidence claims fail where there was probable cause to bind them over for trial. *Robertson v. Lucas*, 753 F.3d 606, 619 (6th Cir. 2014). It is undisputed that Plaintiffs were bound over for trial after their preliminary examinations (i.e., probable cause hearings). As noted in *People v. Reedy*, 151 Mich. App. 143, 147, 390 N.W.2d 215, 217 (1986), ***the primary purpose of the preliminary examination is to establish whether there is probable cause supporting the accusation*** [emphasis added], thus justifying binding over the accused for trial.

As Plaintiffs were both bound over for trial as a direct result of Lockhart's testimony, there is no question that probable cause existed that they committed the murders and, under *Robertson*, that their arrests were lawful.

Once again, Plaintiffs fabrication of evidence claims rely entirely on the shaky foundation of the Nard and Frazier affidavits, which must be excluded where there is no indication either will testify and where the substance of their affidavits pertinent to Plaintiffs claims are impermissible hearsay. Collateral estoppel also bars this claim where the prior probable cause rulings and criminal convictions constitute prior adjudications on the issue of probable cause where Plaintiffs had a full and fair opportunity to litigate this issue. These rulings remain valid in light of the fact the criminal convictions were not overturned by any procedure recognized under *Heck*.

Finally, Defendants-Appellants are entitled to qualified immunity as to the fabrication of evidence allegations where, again, these claims are predicated exclusively on the Nard and Frazier affidavits, which are inadmissible hearsay.

## CONCLUSION AND RELIEF REQUESTED

For these reasons, the Appellants request that this Court overrule the district court and remand the case back to the district court for any further proceedings consistent thereto.

Respectfully submitted,

*/s/ James R. Acho*

James R. Acho (P-62175)
Brandon L. Wykoff (P-81624)
17436 College Parkway
Livonia, MI 48152

Phone: (734) 261-2400
jacho@cmda-law.com
bwykoff@cmda-law.com

Dated: May 9, 2025

**DESIGNATION OF APPENDIX CONTENTS OF APPELLANTS**

Pursuant to Rule 30(b) of the Sixth Circuit Court of Appeals, Appellants hereby designate the following filings or record entries in the Eastern District Court of Michigan as items to be included in the Joint Appendix in addition to any referenced by Plaintiff-Appellee:

| DESCRIPTION OF ENTRY | DATE FILED | RECORD ENTRY | PAGE ID # |
|---|---|---|---|
| Plaintiff's First Amended Complaint | 01/14/22 | ECF 03 | 37-64 |
| Defendants' Second Amended Motion for Summary Judgment and Exhibits | 04/04/24 | ECF 96 | 3511-4834 |
| Plaintiff's Response to the Motion for Summary Judgment and Exhibits | 05/13/24 | ECF 102 | 4853-5822 |
| Defendants' Reply to the Response to the Motion for Summary Judgment | 05/27/24 | ECF 105 | 5828-5837 |
| Opinion and Order on the Motion for Summary Judgment | 02/05/25 | ECF 108 | 5843-5917 |

**CERTIFICATE OF COMPLIANCE**

Pursuant to the 6th Cir. R. 32(g), the undersigned certifies this brief complies with the type-volume limitations of 6th Cir. R. 32(a)(7)(B).

1. Exclusive of the exempted portions in 6th Cir. R. 32(f), the brief contains:

   A. 9,911 words.

2. The brief has been prepared:

   B. in proportionally spaced typeface using: "Times New Roman" in font size 14.

Respectfully submitted,

*/s/ James R. Acho*
James R. Acho (P-62175)
Brandon L. Wykoff (P-81624)
17436 College Parkway
Livonia, MI 48152
Phone: (734) 261-2400
jacho@cmda-law.com
bwykoff@cmda-law.com

Dated: May 9, 2025

**CERTIFICATE OF SERVICE**

I declare under penalty of perjury that on May 9, 2025, I served the foregoing document upon counsel of record via electronic filing through submission of same to the 6th Circuit Court of Appeals website, which will notify counsel of record via email. The above statements are true to the best of my knowledge and information.

/s/ Annamarie L. Moore
Legal Assistant to James R. Acho